**FILED**

*8:11 am, 11/30/20*

**U.S. Magistrate Judge**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

UNITED STATES OF AMERICA,

       Plaintiff,

vs.

KENSEI TAKEUCHI

       Defendant.

Case No:  20-PO-394-MLC

---

### ORDER DENYING MOTION TO SUPPRESS

**THIS MATTER** comes before the Court upon Defendant Kensei Takeuchi's (hereinafter, "Defendant*") Motion to Suppress* [Doc. 7], which was filed on September 8, 2020.  The United States filed its *Response to Motion to Suppress* [Doc. 8] on September 18, 2020. Defendant filed a *Reply to Response* [Doc. 10] on September 28, 2020. The Court held an evidentiary hearing on November 19, 2020. The Court, having fully reviewed the relevant facts and circumstances of this *Motion*, is prepared to rule.

### BACKGROUND

This case involves possession of marijuana within Yellowstone National Park (hereinafter, "Yellowstone"). Yellowstone, much like the rest of the world, has felt the impacts of COVID-19. In March, the National Park Service closed Yellowstone and implemented the Yellowstone National Park Reopening Plan. The plan consisted of three linear phases which, at the National Park Service's discretion, were to be transitioned

through as a means to safely reopen the park. Phase 1 of the Reopening Plan focused on allowing the public into the park, but without overnight stay and limited services. Phase 1 began on May 18, 2020 and stayed in place until June 15, 2020. On June 15, 2020, the National Park Service transitioned into Phase 2. At that time, campgrounds were open and most park amenities were functioning at some capacity.

On June 12, 2020, before Phase 2 was implemented, Park Rangers Zavalea and Bravo were on a routine patrol near the Canyon area of Yellowstone. At approximately 10:34 p.m. the rangers noticed a white Subaru parked in the Wapiti Lake Trailhead parking lot with a sun shield in the front window.  After entering the parking lot, the rangers positioned their cruiser approximately one and a half to two car lengths behind the Subaru and started to report to dispatch. Simultaneously, the Defendant began to open his driver door and exit his vehicle while the rangers turned on their emergency flashing lights.

Immediately after the emergency lights were engaged, the rangers exited their cruiser and approached the Defendant. Ranger Bravo initially asked the Defendant, "how are we doing?" He then asked, "what's going on tonight?" Defendant informed Ranger Bravo that he was just checking his map and "getting ready to get out of [there]". Defendant claimed to have camping arrangements at the Teton View Campsite. Ranger Bravo then informed the Defendant that camping within the park, at that time, was illegal.

The conversational tone of the interaction changed once Defendant presented his identification to Officer Bravo. At this point, Officers Zavaleta and Bravo had smelled the odor of raw marijuana and Ranger Zavaleta spotted a purple marijuana grinder and a sleeping bag in the Subaru. While looking at Defendant's identification, Officer Bravo

2

asked Defendant how much marijuana he had. Defendant told the Ranger that he had "some" and later clarified it was enough "to get him to go to sleep". Defendant was then asked to sit on the curb while the rangers searched the Subaru. Ultimately, a total of 3.64 grams of Marijuana was found. Defendant was issued a warning for illegal camping and issued a violation for possession of a controlled substance pursuant to 36 C.F.R. 2.35(b)(2).

## DISCUSSION

"The proponent of a motion to suppress bears the burden of proof." *United States v. Clarkson*, 551 F.3d 1196, 1200 (10th Cir. 2009) (quoting *United States v. Moore*, 22 F.3d 241, 243 (10th Cir. 1994)). As such, Defendant bears the burden of proof for all claims made in his *Motion to Suppress*. Those claims are (1) the rangers did not have reasonable suspicion of criminal activity prior to seizing the Defendant, therefore making the seizure wrongful, and 2) said seizure took place as soon as the rangers activated their emergency lights. The Defendant argues that had the rangers not activated their emergency lights at the moment they did, they could have legally approached the Defendant, struck up a conversation, and perhaps even look inside the windows of the Subaru. According to the Defendant, such would constitute a lawful consensual encounter between the parties. Instead, the Defendant claims that he was wrongfully seized under the Fourth Amendment upon the moment the rangers activated their emergency lights because, at that moment, the rangers did not have reasonable suspicion of criminal activity.

The Government argues that the initial encounter between Defendant and the rangers was a product of the rangers' community caretaking function, rather than some

type of established police-citizen encounter. In the alternative, the Government claims if the rangers were not acting within their community caretaking function, the interaction between the parties only rises to the level of a consensual encounter. Lastly, even if this Court disagrees and finds something more than a consensual encounter occurred, the Government alleges the rangers had the required level of suspicion.

## I.    Encounters between law enforcement and the public

Several different encounters between law enforcement and the public implicate the Fourth Amendment. Arrest is the most intrusive and is only reasonable if supported by probable cause. *United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir.1996). The next level of contact is that of the investigatory detention which may result from a reasonable suspicion that the detained individual is engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 1871 (1968). The lowest level of contact is a consensual one. A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer. *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir.1996).

Another recognized encounter between law enforcement and the public is a non-investigatory encounter pursuant to law enforcement's community caretaking functions. Police officers are permitted to exercise what the Supreme Court has termed "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *United States v. Zimmerman*, 116 F. Supp. 3d 1280, 1285 (D. Wyo. 2015) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441,

93 S.Ct. 2523, 2527 (1973)). In the course of exercising this non-investigatory function, a police officer may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public and/or the individual. *Id*. Whether the seizure of a person by a police officer acting in his or her non-investigatory capacity is reasonable depends on whether it is based on specific articulable facts and requires a reviewing court to balance the governmental interest in the police officer's exercise of his or her "community caretaking function" and the individual's interest in being free from arbitrary government interference. *Id*.

II.     **The encounter was multifaceted and began as a non-investigatory encounter**

The interaction between the Defendant and the rangers began as a non-investigatory encounter pursuant to the rangers' community caretaking function. On June 12, 2020, during a truly unprecedented time, the Yellowstone National Park Reopening Plan was in full effect. Said plan had banned all camping within the park, including permits for backcountry camping. Defendant's car was seen alone within a trailhead parking lot at approximately 10:34 p.m. during this period. Further, as the Government mentioned it its brief, lost and/or injured hikers are unfortunately a common occurrence here in Yellowstone. The Court has serious doubts as to how one could expect a Park Ranger, or any park employee for that matter, to not be concerned and suspicious under similar circumstances. Importantly, the Supreme Court has not just permitted law enforcement to act pursuant to their community care taking functions, but rather expects them to.

5

*Zimmerman*, 116 F. Supp. 3d at 1286. As such, Park Rangers Zavalea and Bravo justifiably initiated their encounter with Defendant under an authority they were *expected* to exercise.

Although the rangers were legally exercising their powers when initiating the encounter with Defendant, it would be remiss of the Court not to assume the rangers also had a "hunch" that Defendant could be illegally camping. That "hunch", however, cannot be allowed to negate the community care taking functions of the rangers. "Search or seizure undertaken pursuant to the community caretaking exception is not infirm merely because it may also have been motivated by a desire to investigate crime." *United States v. Coccia*, 446 F.3d 233, 240-41 (1st Cir. 2006). In that this Court finds that the contact by the rangers was justified in pursuance to their caretaking function, the Court will not review whether the rangers also had a reasonable suspicion that the Defendant was engaged in illegal conduct of camping in an undesignated area prior to their initial contact with Defendant.

## III.    Activation of emergency lights

Central to Defendant's argument is the proposition that the rangers seized Defendant, for Fourth Amendment purposes, the moment they activated their emergency lights. Defendant argues that the rangers asserted their authority when they activated their emergency lights, he submitted to that assertion by "stopping dead in his tracks", and a reasonable person would not feel free to leave under the totality of the circumstances. To support his contention, Defendant cites to cases and a treatise suggesting that the use of

police car emergency lights as a show of authority will convert an encounter to that of a Fourth Amendment seizure.[1] Admittedly, the argument is intriguing.

As was correctly discussed in Defendant's briefing, in the Tenth Circuit when an officer does not apply physical force to restrain a suspect, a Fourth Amendment seizure can only occur if 1) the officer asserts her authority and 2) the suspect submits to that assertion. *United States v. Salazar*, 609 F.3d 1059, 1064 (10th Cir. 2010). However, the *Salazar* court also pointed out that, "the test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person… [and] [t]he question of whether the suspect submitted to that authority is also an objective one." *Id*. at 1064. Additionally, courts must examine the "totality of the circumstances-the whole picture" when deciding whether conduct constitutes submission to authority. *Id*.

---

[1] Most of Defendant's citations stem from *United States v. Silcott*, 377 F. Supp. 3d 1272, 1277 (D. Kan. 2019), which the Court presumes is where he found this passage:

> "Thus, '[w]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submit[s] to the assertion of authority.'' *United States v. Salazar,* 609 F.3d 1059, 1064 (10th Cir. 2010) (citing *Hodari D.*, 499 U.S. at 626, 111 S.Ct. 1547)). The use of police car emergency flashing lights to make a traffic stop, as was done here, can constitute a show of authority. *See Brendlin v. California*, 551 U.S. 249, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007) (all occupants of a car were seized by officer's 'successful display of authority' in using flashing lights to make traffic stop). *See also Gaines*, 918 F.3d at 796-97 n.4 (citing 4 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 9.4(a), at 598–99 (5th ed. 2012) (stating that the 'use of flashing lights as a show of authority ... will likely convert the event into a Fourth Amendment seizure'))."

The case at hand, though, differs from those cited by Defendant. In *Salazar*, the trooper activated his emergency lights to command the driver to stop his vehicle. The command to stop came after the officer observed the defendant acting suspiciously late at night in a parking lot. Admittedly, in *Salazar* the Government and the defendant both agreed the officer's use of emergency lights constituted a "show of force" and the case turned instead on whether the defendant submitted to that force. However, that does not change the subtle fact that the defendant in *Salazar* was in a moving car and suspected of criminal activity. As cited in *Salazar*, the appellant stated "[t]he activation of a patrol car's emergency lights is a well-accepted 'show of authority' commanding the driver to ***stop*** his vehicle and submit to an investigative detention". *Id*. at 1066 (emphasis added). The court also cited to *Brower v. County of Inyo*, 489 U.S. 593, 598 (1989), stating that "a police car ***pursuing*** with flashing lights" is "a significant show of authority". *Id*. (emphasis added).

Similarly, in *Silcott* the officer activated his emergency lights to command the driver to stop his vehicle. That command came after the officer suspected the driver of being involved in a burglary. With respect to emergency lights, the court said,

> "The court finds that a reasonable person in Defendant's position would not have felt free to leave or to disregard the officer's flashing lights. The officer thus made a show of authority. The remaining disputed question is whether Defendant submitted to the show of authority such that a seizure occurred."

*Silcott*, 377 F. Supp. 3d at 1277.

In *Silcott* there was nothing dispositive about the activation of emergency lights. Rather, the court considered the activation of emergency lights in its analysis of "a reasonable person in Defendant's position." Again, this is a case where the

defendant was in a moving car and suspected of criminal activity. The officer in this instance activated his emergency lights in an effort to pull the defendant over. *Id*. at 1275. Like the above cases, the *Silcott* court found no difficulty in finding an activation of emergency lights was an assertion of authority during a traffic stop.

*Brendlin* too stems from an officer using his emergency lights to command a car to stop. *Brendlin*, 551 U.S. at 249 (2007). The *Brendlin* court ultimately held when the police made a traffic stop, the passenger in the car was seized alongside the driver. The case relied on a well-established rule that traffic stops equate to seizures under the Fourth Amendment, which is not at issue today.

The *Gaines* case is admittedly much more on point. In that instance, the Defendant was sitting in his car, parked in a parking lot, when two uniformed police officers arrived in marked police cars, both flashing their emergency lights. *United States v. Gaines,* 918 F.3d 793, 796 (10th Cir. 2019). In determining whether a seizure occurred at that moment, the *Gaines* court said, "[w]ould a reasonable person have felt free to leave? Perhaps. But the flashing roof lights, two marked police cars, and two uniformed officers would undoubtedly have cast at least some doubt on a reasonable person's belief in his or her freedom to leave." The officers claimed to have turned on their emergency lights because they were blocking traffic. However, as the *Gaines* court correctly pointed out, the officers' subjective intent has little bearing on whether a reasonable person would have thought that he or she could leave. *Id*.

Next, one of the officers quickly exited his cruiser and gestured for the defendant to exit his vehicle. At this point, the court seriously doubted that a reasonable person would

have believed they could drive away. *Id*. at 798. Still, the court decided to assume that at this point a reasonable person would feel free to leave. Finally, one police officer stood just a few feet away and said that they had come because of a report that the defendant was selling drugs. *Id*. The police officer then asked the defendant whether he had in fact been selling drugs. *Id*. Meanwhile, another uniformed police officer circled the car, looking inside. *Id*. Eventually the defendant fled, leaving the government to argue that he never yielded to a show of authority, regardless of when that show happened. *Id*. at 799. The court disagreed. Instead, while looking at the totality of the circumstances, the court decided the defendant yielded to the show of authority when he complied with the gesture to get out of his car and when he answered questions that were asked of him. *Id*.

The Court has no problem distinguishing *Salazar*, *Silcott*, and *Brendlin* from the case before it. All those cases apply to traffic stops, or at least moving vehicles, in relation to the use of emergency lights. Those facts are simply not applicable to this matter. The *Gaines* case, though, is not so easily distinguished. Like *Gaines*, Defendant was inside of his car, in a parking lot, and had two uniformed police officers arrive in a marked police car, flashing their emergency lights. However, that is about all the two cases have in common. In *Gaines*, the officers approached the defendant and engaged their lights due to a tip that he had been selling drugs. Here, the officers had no such suspicion. In *Gaines*, the officers gestured to defendant to get out of his car and immediately began asking him questions of alleged drug dealing. Here, Defendant exited his vehicle without command and the rangers initially asked question far less intrusive or abrupt. The *Gaines* court said, when discussing the questioning from the officers, "… the accusatory question would have

added to the reasonable person's doubt about his or her freedom to return to the car and drive away." *Id*. at 798. In this matter, questions adding such a doubt to the reasonable person were not presented to Defendant until he was asked about how much marijuana he had.

The totality of circumstances in the case before the Court differs dramatically from that in *Gaines*. The case before the Court does not concern a car, in broad daylight, parked in Kansas City. It does not involved officers pulling up, blocking traffic, turning on their emergency lights, and demanding action of the car's occupant. It also does not involve an officer immediately questioning the individual about alleged drug dealing. Instead, here the Defendant's car, at approximately 10:34 p.m., was turned off and parked at a trail head in Yellowstone during a time when no camping was allowed. The rangers activated their emergency lights not to investigate expected criminal behavior, but pursuant to their community caretaking functions and to identify themselves as law enforcement officers. The ranger did not jump to accusatory questions, but instead asked Defendant how he was doing and what he was up to.

The Court finds cases cited by Defendant to be unpersuasive. Therefore, with respect to the circumstances in this case, the activation of the ranger's emergency lights was not a show of authority for Fourth Amendment purposes.

**IV.    Defendant was seized by the Rangers when they began questioning him about marijuana**

There is no question a seizure took place on the night at issue. Instead, the inquiry is when did that seizure take place and was it justified by reasonable suspicion. As has already been explained, when an officer does not apply physical force to restrain a suspect, a Fourth Amendment seizure can only occur if 1) the officer asserts her authority and 2) the suspect submits to that assertion. *Salazar*, 609 F.3d at 1064.

First, we must start with when a show of authority took place. "The test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Id*.  So, when during this encounter would a reasonable person, due to the rangers' actions, perceive he was not free to leave?

After engaging their emergency lights, it took the rangers approximately eleven seconds to exit their cruiser and begin talking with Defendant. During this time, Defendant had exited his vehicle and was standing next to it with his driver door open. Ranger Bravo asked Defendant how he was doing and what he was up to that night. In fact, Ranger Bravo even gave the Defendant some advice by telling Defendant that all camping within the park was prohibited. A reasonable person, up to this point in the encounter, would still feel free to leave. Defendant felt free to exit his vehicle, he engaged in an informal conversation discussing his plans that night, and admitted he didn't know that camping was currently illegal in the park.

Eventually, Ranger Bravo asked Defendant for identification. Being asked to show identification requires a defendant to act, but according to our Supreme Court it does not rise to the level of a seizure. *Florida v. Bostick*, 501 U.S. 429, 435, 111 S. Ct. 2382, 2386 (1991). However, while looking at Defendant's identification, Ranger Bravo began to ask Defendant how much marijuana he had. With respect to this case, when Defendant was faced with an accusation of illegal conduct by the ranger, an assertion of authority was made. That is, the ranger's words and actions would have conveyed to a reasonable person at that point in the encounter that they were not free to leave.

Next, the Court must decide when Defendant submitted to that authority. The question of whether the suspect submitted to a show of authority is also an objective one. *Id*. at 1064. Additionally, courts must examine the "totality of the circumstances-the whole picture" when deciding whether conduct constitutes submission. *Id*. It is the Court's belief that Defendant submitted to the rangers' authority immediately upon being asked how much marijuana he had. Without hesitation Defendant answered the question, admitting to a law enforcement officer he was engaged in illegal activity. Once Defendant admitted to the rangers he had illegal substances with him, a Fourth Amendment seizure had been completed.

## V.    Reasonable suspicion arose moments into the non-investigatory encounter between Defendant and the rangers

Although the encounter between Defendant and the rangers started as non-investigatory, it took all but moments for reasonable suspicion to arise justifying the

rangers' investigatory detention of Defendant.  An evaluation of an investigatory detention, which is often referred to as a *Terry* detention, is a seizure pursuant to the Fourth Amendment and must satisfy a two-prong analysis. The first inquiry is if the officer's actions were justified at the inception of the detention. The officer must have an articulable and reasonable suspicion that the person detained is engaged in criminal activity. The second inquiry is if the officer's detention is reasonably related in scope to the circumstances which justified the interference in the first place. *Zimmerman*, 116 F. Supp. 3d at 1287 (quoting *Terry v. Ohio*, 392 U.S. 1 (1968)).

First, were the rangers' actions justified at the inception of the detention by articulable and reasonable suspicion that Defendant engaged in criminal activity? Soon after the rangers and Defendant began talking it became clear Defendant was safe and uninjured, therefore rendering the rangers' community caretaking function complete. However, during the greeting and before the rangers could reach that conclusion, the rangers discovered Defendant was wearing a headlamp, his car had bedding spread over the back seat and trunk, a sunshade was covering the front windshield, and they could smell the odor of raw marijuana. All of which raised or further supported an articulable and reasonable suspicion that Defendant was engaged in criminal activity, if not reaching the level of probable cause.

Second, was Defendant's detention reasonably related in scope to the circumstances which justified the interference in the first place? The suspicion arising from the first few moments of the encounter explain why Ranger Bravo's questions shifted from ensuring Defendant's safety to investigating potential criminal activity by asking "so, you're not

planning on sleeping here at all?" and "so, how much marijuana do you have in the vehicle?". Ultimately, Defendant was detained to investigate the criminal activity of possession of marijuana and illegal camping, both of which were the very criminal activities that the rangers had reasonable suspicion of.

## VI.    CONCLUSION

The Court finds that the encounter between Defendant and the rangers started as a non-investigatory exercise of the rangers' community caretaking authority. Moments into the encounter 1) it became clear that Defendant was safe and 2) reasonable suspicion of illegal camping and possession of a control substance arose. Then, with the required level of suspicion, the rangers detained Defendant to further investigate. That investigation lead to the finding of marijuana in the Defendant's possession and evidence of illegal camping. As such, the Court concludes the evidence should not be suppressed.

**IT IS HEREBY ORDERED** that Defendant's *Motion to Suppress* is **DENIED**.

Dated this 30th day of November, 2020.

_____

MARK L. CARMAN
UNITED STATES MAGISTRATE JUDGE